# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Dr. Deborah R. Coen,                                    Civil No. 05-596 (PJS/RLE)

      Plaintiff,

v.                                                      **REPORT AND**
                                                        **RECOMMENDATION**

Louis Coen, Daniel Coen, Anita
Ariella Coen, Carole M. Coen,
Nicholas Jackson Clark, Peter John
Bunker, Compayne (Hampstead) Limited,
Trustees of the Victor Coen Will Trust,
Trustees of the Miriam Coen Will Trust,
Trustees of the Estate of Ms. Lily Coen,
John Doe One, John Doe Two,

      Defendants.

---

Nathan A. Busch, Esq., on behalf of Plaintiff

Christopher T. Shaheen, Esq., and Bryan C. Keane, Esq., on behalf of Defendants

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned matter comes before the Court on Defendants' Amended Motion to Dismiss (Doc. No. 77).  This motion has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons set forth below, the undersigned recommends granting Defendants' motion and dismissing this action in its entirety without prejudice.

## I.      BACKGROUND

### A.      <u>Procedural History</u>

Plaintiff filed this action on March 21, 2005.  (Doc. No. 1.)  On July 10, 2005,

Plaintiff filed her First Amended Complaint (FAC).  (Doc. No. 43.)  The 159-page FAC

(Doc. No. 43) incorporates by reference over 1500 pages of exhibits and other materials

(<u>see</u> Doc. No. 1 at 5, 43 at 8).  The list of exhibits itself is over seventy-five pages in

length.  (FAC (Doc. No. 12) Appendix Exhibit List.)  Plaintiff describes this case as

"primarily a fraud case."  (Pl.'s Mem. (Doc. No. 120) at 1.)  The alleged fraud concerns

Defendants' actions in connection with the disposition of certain shares of a family-

owned foreign company, Compayne (Hampstead) Limited, which is principally located in

Great Britain (FAC ¶ 8).  The named Defendants sharing Plaintiff's last name are related

to Plaintiff.  (Busch Decl. (Doc. No. 121) Ex. VII.A.)  The action also concerns the trusts

and estates of deceased members of Plaintiff's family.  (<u>Id.</u>)  The named Defendants are

all residents of Great Britain or France; Plaintiff is a citizen of Minnesota.  (FAC at 2-3.)

The FAC contains ten counts: (1) fraud by intentional misrepresentation; (2) fraud by

negligent misrepresentation; (3) fraud by non-disclosure of material fact; (4) breach of

fiduciary duty by the trustees of the Victor Coen Trust; (5) breach of fiduciary duty by the

trustees of the Miriam Coen Will Trust; (6) breach of fiduciary duty of the trustees of the

Lily Coen Estate; (7) breach of fiduciary duty of the directors of Compayne; (8) mail

fraud by Louis Coen; (9) wire fraud by Louis Coen; and (10) breach of fiduciary duty to

Edward Coen by John Doe I and John Doe II.  (FAC at 123-58.)

On August 1, 2005, Defendants filed a motion to dismiss this action for lack of

2

personal jurisdiction.  (Doc. No. 51.)  On August 22, 2005, the Honorable Magistrate

Judge Jonathan Lebedoff stayed all discovery in the above-captioned matter.  (Doc. No.

72 at 5.)  In the same order, Magistrate Judge Lebedoff carved out a limited exception

to the stay for jurisdictional discovery:

> Because Defendants' challenge to personal jurisdiction is in part a factual
> dispute, Plaintiff is allowed to pursue limited personal jurisdictional discovery
> at this time.  Plaintiff may serve on each Defendant a total of twenty discrete
> written discovery requests pertaining to personal jurisdiction.  Collectively, the
> named Defendants may serve a total of twenty such discovery requests on
> Plaintiff.  Without the consent of the opposing party, no general discovery
> may be propounded and no depositions may be taken.

(Doc. No. 72 at 5-6.)  On August 31, 2005, this case was reassigned to the undersigned

magistrate judge.

On October 21, 2005, Plaintiff served discovery requests on each of the named

defendants.  (Pl.'s November 18, 2005 letter to Court at 1).  On October 24, 2005, she

served a set of amended requests on three of the defendants.  (Id.)  Plaintiff served two

interrogatories, three requests for production of documents, and fifteen requests for

admissions on each defendant.  Defendants objected to these requests and the Court

held a status conference with the parties on November 23, 2005 concerning the dispute.

Defendants contended that Plaintiff's requests exceed the numerical limitation imposed

by Magistrate Judge Lebedoff's August 22, 2005 Order, were not limited to seeking

information concerning personal jurisdiction, and improperly sought admissions

regarding matters of law.  (Defs.' November 22, 2005 letter to the Court at 2-3.)  Plaintiff

contended the objections were without basis.  (Pl.'s November 18, 2005 letter to Court

at 11-14.)

After a review of the matter, this Court ordered Defendants to fully respond to

3

Plaintiff's requests for production and either (1) fully respond to Plaintiff's Requests for Admissions and Interrogatories; or (2) in lieu of responding to the Requests for Admissions and Interrogatories for any given defendant, produce that defendant for a deposition lasting up to but not longer than 3.5 hours either in person in the United States or via telephone.  (Doc. No. 89.)  On February 14, 2006, the Court held another status conference with the parties during which the Court directed Plaintiff to pay for the cost of translating her discovery requests from English into French for three of the defendants.  (See Doc. No. 91.)  On February 27, 2006, Plaintiff served the translated discovery requests.  (Pl.'s Mem. at 3.)  Defendants served their responses on March 24, 2006.  (Id.)

On March 31, 2006, Plaintiff moved to compel responses to some of the jurisdictional discovery described above.  (Doc. No. 92.)  The Court denied in part and granted in part Plaintiff's motion to compel.  (Doc. No. 119.)  Now that the above jurisdictional discovery stage has ended, Defendants move again to dismiss Plaintiff's action for lack of personal jurisdiction.  (Doc. No. 77.)  In the alternative, Defendants move to dismiss the action pursuant to the doctrine of forum non conveniens, to dismiss the action for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), and/or "for an order striking the redundant and lengthy evidentiary narratives in Plaintiff's Amended Complaint" pursuant to Federal Rules of Civil Procedure 8, 12(e), and 12(f).  (Id.)

Plaintiff also filed a Motion for Summary Judgment or, in the Alternative, Motion for Evidentiary Hearing on the Issue of Personal Jurisdiction (Doc. No. 102).  The Court did not schedule Plaintiff's motion for oral argument but informed Plaintiff that Plaintiff

could make the same arguments and cite to the same evidence merely by defending against Defendants' motion to dismiss for lack of personal jurisdiction.  The Court informed the parties that it would address Plaintiff's motion if anything remained to be decided after a ruling issued on Defendants' dismissal motion.  Therefore, the Court limits its discussion below to Defendants' Amended Motion to Dismiss (Doc. No. 77).

**B.    Facts**

Victor and Miriam Coen, citizens of Great Britain, had three children: Edward, Louis, and Lily.  (FAC (Doc. No. 12) Ex. I.B. App. Part I Tab 1, 2.)  Edward Coen is a citizen of Minnesota (Busch Decl. (Doc. No. 121) Ex. VII.B) who has assigned his interest in this litigation to his daughter, Plaintiff Deborah Coen (Id. Ex. VII.E).  As noted above, Plaintiff is a citizen of Minnesota.  (FAC at 2.)  Edward also has two sons, Ethan and Joel.  (FAC (Doc. No. 12) Ex. I.B. Part I.)  Louis Coen, and his three children, Daniel, Anita Ariella, and Carole, are all residents of France.  (FAC at 2.)  The remaining named defendants are citizens of foreign lands, either France or England.  (Id. at 2-3.)

Victor and Miriam Coen initially each held 4950 shares of Compayne and Edward and Louis each held three shares.  (FAC (Doc. No. 12) Ex. I.B. Part I.)  Victor Coen died in 1966.  (Id.)  At the time of Victor's death, his daughter Lily was institutionalized due to a medical condition and remained so until her death.  (Id.)  Victor Coen's Will provides in part: "I earnestly request my said sons Louis and Edward respectively (but without imposing any trust or legal obligation) that they and their personal representatives will hold and deal with the said last mentioned equal sixth shares of my residuary estate for the benefit of my daughter Lily . . . in such manner generally and for such purposes generally as love and a wide discretion and respect for our memories shall in their

5

judgment require." (FAC (Doc. No. 12) Ex. IB (Part 2) Append. Tab. 1 § 1.) Victor's will established the Victor Coen Will Trust, designed to support his daughter, Lily Coen, during her lifetime, thereafter the assets of the trust being divided equally between her brothers Edward and Louis. (Id.) Victor's will trust was administered by his wife Miriam Coen until her death in 1989 after which the trust's assets were managed by Trustees John Bunker, Nicholas Jackson Clark, and Louis Coen. (FAC (Doc. No. 12) Ex. I.B. Part I.) Victor's shares of Compayne were distributed in 1992 to Edward, Louis, and Lily. (Id.) All of the assets of the Victor Coen Will Trust are in Great Britain and the trust has never owned any assets in the United States. (Id.)

Before her death in 1989, Miriam Coen's shares of Compayne were transferred to Edward and Louis with the exception of ten shares that were transferred at her death to the Miriam Coen Will Trust. (Id.) After Miriam's death, the trustees of the Miriam Coen Will Trust transferred the ten shares of Compayne in unequal amounts to the Edward and Louis Coen families and to Lily Coen. (Id.) Plaintiff refers to the distribution of Victor's shares and the Miriam Coen Will Trust shares as the "1992 Transaction." (Id.) The "1992 Transaction" resulted in Edward Coen and his family owning two fewer shares (4126 shares) than Louis Coen and his family (4128 shares). (Id.) All of the assets of the Miriam Coen Will Trust are in Great Britain, none of which have ever included United States assets, and all of which are entrusted to the trusteeship of Bunker, Clark, and Louis Coen. (Id.) Lily Coen died on March 14, 2002. (Id.) Her English estate, which includes only English assets, is administered by Louis Coen. (Id.) Her estate is to be divided equally between Louis and Edward. (Id.)

Louis Coen was a director of Compayne from 1961-1996. (FAC at 24.) Plaintiff's

father, Edward Coen, a retired economics professor at the University of Minnesota, was

a director of Compayne from 1962-1996.  (Id. at 24.)  Edward Coen resigned as a

director in 1996.  (FAC at 25.)  Nicholas Jackson Clark became the sole director of

Compayne in 1996.  (Id.)  Louis' son, Daniel Coen, became the Secretary of the

company in 1996.  (Id.)  Until March 31, 1999, Edward owned 4126 shares[1] of

Compayne, either individually or with his wife Rena; Louis and his children owned 4128

shares; and Lily owned 1655 or 1666 shares.  (FAC (Doc. No. 12) Ex. I.B. Part I.)

On November 9, 1994, in a letter from Louis Coen to Edward Coen, Louis states:

> I understood in July that you wanted to cash-in on your holding within the near future, so it is a sudden change that you want now to postpone it.  I have been busy since July trying to sort out the different legal, financial and tax questions.  The time I have put in to elucidate the different legal and tax matters is not lost, however, because we still need that and even more information to make possible any 'agreement' on the buy back of your shares. . . . In any case, I advise you strongly to take advice from your tax advisor, now, not later. . . . I enclose two opinions of the corporation tax solicitor that I consulted this summer that may raise some of the issues of double taxation and of company law. . . . In the mean-time I am stopping my work here on the project until I know better what you want to do.

(Busch Decl. (Doc. No. 121) Ex. VII.H at 4-5.)  On November 25, 1994, Edward wrote to

Louis:

> As I understand it, Compayne shares are now divided as follows: Lily, 16%; "You," 42%; "me," 42%.  Excluding Lily's share, Rena and I are willing to "accept" 36% of all Compayne assets (less Lily's share), giving you 48%.  That is, a 4 to 3 division in your favor.  Note: I do not expect to claim my share until perhaps 5 to 10 years from now. . . . If it should turn out that you and I inherit Lily's share (16%), the same 4 to 3 split would be acceptable to me (unless she provides otherwise).  Mr. Trask seems to be very competent.

---

[1] Plaintiff sets forth exactly how Edward, Louis, and another shareholder, Charlie Freeman, came into possession of their shares at pages forty-six through forty-seven of her FAC.  (Doc. No. 43.)

He should probably draft a more formal document containing the above ideas.

(Id. at 7-11.)  In that same letter, Edward proposed that Compayne raise the funds to buy him out by selling real estate owned by Compayne.  (Id.)  On December 2, 1994, Louis wrote to Edward to inform him that he had spoken with Compayne's accountant "concerning your wish to have a written agreement set up to sell your shares . . . ."  (Id. at 13.)  On December 27, 1994, Louis wrote Edward and stated:

As to the split of the shares I did not ask for or even expect this reduction in your percentage of the shares that you propose, and on behalf of the children we thank both you and Rena.
. . . .
Your proposition raises . . . several issues. . . .
. . . .
Another issue is how and who should make the evaluation of the property at the time you decide to liquidate your shares.  This costs, I believe, a substantial amount of money unless Mr. Arnold does it.  He is not, however, an "expert."

(Id. at 16-17.)  On January 7, 1995, Edward wrote to Louis:

Yes. We want to stick with the 36/48 sharing proportion.  That makes more sense than basing anything on the relative values of the two buildings, since that could change over time. . . . Who should evaluate the properties at such time as a division is requested?  That question has no easy answer perhaps we would be happy with any reasonably competent assessor.  Does Ariella have expertise in this area?  Or in choosing the person to assess property?

(Busch Decl. (Doc. No. 122) Ex. VII.H at 21.)

On March 26, 1995, Louis wrote to the English attorney, M. Trask, who was to draft the agreement concerning Edward's shares.  (Id. at 23.)  Louis indicated that the shares of Compayne were split as follows: Rena & Edward Coen, 4126 shares, Louis Coen, 4128 shares, and Lily Coen, 1666 shares.  (Id.)  Louis stated: "Ed has offered since it is he who is requesting this special arrangement, that he relinquish to Lou

8

Coen's family 6% of his shares or the value thereof, i.e. 248 shares, and also 6% of

Lily's shares, i.e. 99 shares or of the value thereof, to be passed on to him or to his

family at her death." (Id. at 24.)  Louis also stated, "I am sending a copy of this letter to

Ed so that he can make any further comments to me or to you directly." (Id. at 26.)

Also in March 1995, Edward wrote to Louis:

> Letter to Trask is fine.  There is one computational error.  Each family now
> possesses 42% of the shares:
> Me 42%; You 42%; (Lily 16%)
> Excluding Lily, our joint holdings are 84% of total shares.
> My proposal is:
> Me 36%; You 48 % (Lily 16%)

(Id. at 27.)  On September 7, 1995, Louis wrote to Edward:

> I have done below . . . a case study supposing that you wished to exercise
> your option to sell out today, assuming today's company laws, tax burdens,
> value of the buildings, and the company's current financial position.  Some
> of the figures are exact, other are not. . . .
>
> Arnold's evaluation of the two properties (11/30/94) is £1,060,530 and we
> have approximately £200,000 in liquid assets.
>
> Distribution of shares today:
> Ed & Rena    4126   41.6%
> Lou's Family  4128   41.6%
> Lily              1666   16.7%
>
> Your proposition of 11/25/94 states that you will make gifts of shares to Lou's
> family so that you will end up possessing approx. 36% of shares and Lou's
> family approx 48%.  If we take into account Lily's holding, the shares would
> be redistributed as follows:
> Total shares of Ed & Lou = 8254
> Ed's shares would be,       (35.7%) = 3538
> Lou's shares                    (47.5%) = 4716
> Lily's shares                   (16.8%) = 1666
> Value Ed's shares           £(1,261,000/9920) x 3538 = £449,740
> Value Lou's shares          £(1,261,000/9920) x 4716 = £599,483
> Value Lily's shares          £(1,261,000/9920) x 1666 = £211,777
> . . . .
> Our liquid assets being around £200,000 we would have to take the decision

9

> to mortgage the property to borrow £249,740. . . . An alternative solution of
> financing the buy-back would be to sell one of the properties, say the one in
> Compayne Gardens: Present day value of this property (see report Arnold)
> is £354,000.

(Id. at 31.)  In October-November 1995, Louis and Edward scheduled a face-to-face
meeting in New York, New York to coincide with Edward and Rena's planned trip to
New York (Edward's sons apparently lived in New York at the time) to discuss Edward's
sale of his shares.  (Id. at 35-36.)

On October 30, 1995, Louis wrote to Edward, informing Edward of three options
for the financing of the buy-out of Edward's shares.  (Id. at 37.)  That letter repeats the
figures set forth in the September 7, 1995 proposal (supposing that Edward exercised
"[on September 7, 1995 his] option to sell . . . with current company laws, tax burdens,
value of the buildings, and the company's current profits and financial position etc.").
(Id. at 37-38.)  Louis stated, "Some of the figures used are approximate, and it[']s
possible that I ignore some tax and legal problems.  However they are sufficient to
demonstrate the issues involved."  (Id. at 37.)  Louis proposed three "options" to finance
Edward's buy-out: (1) mortgage the Compayne Gardens property; (2) sell the
Compayne Gardens property; or (3) have Edward sell off only a number of shares
equivalent to the corporation tax each year to avoid Compayne having to pay the
advanced corporation tax.  (Id. at 38-39.)

In early December 1995, Louis, Edward, Rena, Joel, Ethan, and Daniel met in
New York City.  (Defs.' Mem. at 7.)  Daniel Coen has filed an affidavit in which he states
that he did not communicate with Edward concerning the terms of the sale of Edward's
shares.  (Keane Decl. (Doc. No. 101) Ex. F.)

On December 21, 1995, Edward wrote to Louis:

> I think your trip to New York was very useful . . . . on further thought, I am not as confident that we can count on a substantial increase in [Compayne Gardens] value in the short term.  One reason is that the market can go down as well as up. . . . I now feel strongly that we should proceed promptly to clear the decks of this issue. . . . I should certainly have brought this up at the time of our meeting in New York.  I do not know for sure, why I did not.  There could be three reasons.  First, I have a memory that sometimes functions well, and sometimes doesn't function at all.  Second, my thought processes are so slow.  And third, I am always persuaded by the person currently talking to me. . . . [W]hat the Company pays us for all of our shares should reflect the 36%-48% formula, and it should also reflect a further deduction of any capital gains tax on the proceeds from selling Compayne Gardens and securities. It may be relevant that we own only a minority of the shares for which there is no market, so that the value of our shares is <u>legally</u> what you are willing to pay for them.  Therefore, after subtracting the capital gains tax on the sale of Compayne Gardens and securities, the resulting outlay to buy our shares may be less than 449,740 pounds.  I am not sure that the foregoing calculations are correct and I imagine that there are other complications, but I would like to move toward an agreed document quite soon.  I hope that this is agreeable to you.  I believe that everyone can come out ahead if we can resolve this business.

(Busch Decl. (Doc. No. 123) Ex. VII.H at 40-41.)  In a letter dated January 18, 1996,

Louis responded to Edward:

> I was speechless by your letter announcing the sudden turn-around on what we all agreed to in N.Y. one month ago that I had to take my time to think it all out. . . . I have written below what we had decided in NY.  It is essential that you take the time and effort to review [the summary of the conclusions of the NY meeting] thoroughly. . . .
>
> 1. We foresaw that property values would probably rise in the future in Hampstead.   Assuming these are correct assumptions no one has an advantage in rushing into a sale of property. . . .
> . . . .
> 4. We need three years to capitalize on the substantial improvements and investments we have made over the last 10 years and which will permit us to minimize the expenses and thus increase the profitability, of the company during these 3-years before we sell out.  The better the last three annual financial statements are, the better the selling price.
>
> There is no way, therefore, except at the expense of all the shareholders, to

sell shares in less than three years. . . .

. . . .In going through my files on the company shares last week I fell upon the papers concerning Dad's will.  He wanted that 50% of his estate was to be put aside in case of a need by Lily.  He deliberately left legally less to Lily so that the money would not be tied up unnecessarily and incure added inheritance tax.  Yet we have been busy during the last 1 1/2 years trying to dispose of her money.  All of us, you and I, have a heavy responsibility in having forgotten the terms of Victor's will despite that we all made a written commitment to follow his wishes.

In my opinion this forecloses the idea of you or us now selling out more than about 1/2 of our shares.  Lily has already 1/16 of the total. . . . When and who will decide to take her share of her money out of the company?

In order to figure out where we can go from here, it would be helpful to go back to the starting point 18 months ago when you made your first request to cash in your shares.
. . . .
In July '94 you indicated that you wanted to cash in on your holding in the near future. . . . Five months later in October, before I had finished the study, you changed your mind and you no longer needed the money now but would like to have an option to sell in 5-10 years . . . . After a great deal of work and expenditures . . . this turned out to be impractical, and you then returned to your original request to sell-out of your holdings as soon as reasonably possible . . . . This proved impractical also, and you agreed in NY to the 3 year plan.  A month later you reneg on that plan and announce that you want to sell your shares now ignoring the difficulties and the prejudice for the other shareholders pointed out in NY.
 . . . .
As soon as we reach a meeting of minds we can then start immediately to work on the next steps to prepare the way for you, if that's what you still wish, to cash in on as many shares as possible without infringing on Lily's interests.

(<u>Id.</u> at 42-44.)  Edward responded to Louis in a letter dated January 25, 1996:

I have been thinking some more about Option 2, and enhancing the numbers in the direction that might make it more attractive from your point of view.
The essence of the proposal is this.  I am willing to take a further deduction in our share, from 36% to 33%.  Furthermore, I am willing to see that 33% of the "asset" value further reduced by the amount of nearly all the tax and other costs incurred by the Company incidental to purchase of the shares. . . . The amount left after these deductions is approximately 300,000.  This would be the price of record received by us for all our shares. . . .

. . . .

After we received the 300,000 we are willing to segregate 100,000 in a special trust for Lily's use if she should need funds during her lifetime.

If my memory is correct, I believe you told me some time ago that you believed that it was Victor's intent that she should have a one third share in the Company. But I am not sure if that recollection is correct.

If you feel that this proposal is unfair to your family, I will naturally be willing to consider whatever suggestions you may make. But I do want to clear the decks of this issue as soon as it reasonably can be accomplished.

(Id. at 45, 47.) In a letter dated, January 31, 1996, Edward wrote to Louis:

I have mailed to Joel all of the relevant material in my file, going back at least two or three years, and in a few instances earlier. I think it is pretty complete. I am perfectly content to let you and Joel work out a consensus that is acceptable to all parties. All I want is an agreement that is fair for everyone.

(Id. at 48.)

Edward wrote to his two sons on February 1, 1996:

This is a follow up . . . of the material in my letter to Louis dated Jan. 25, 1996. It provides Louis with a significant delay in the buyout of our shares. It allows for the three year delay that he desires for adapting to IRS rules. In addition it may offer him a significant delay beyond that. It also suggests what may be a feasible and fair arrangement for safeguarding Lily's moral claim on 50% of the Company's assets to the extent that she may need it.
(1) The buyout of our Shares:
To take care of the IRS problem, we would commit to not ask for a buyout before Jan. 1, 2000. That is a delay of nearly four years. . . . After that date we wiould (sic) refrain from asking for a buyout until we perceived a need for the money. . . . Once our need is declared . . . . we would claim only 33%, instead of 42%, of the "asset" value of the totality of all shares, minus the tax and other costs . . . . at this point they are only proposals for discussion.

(FAC (Doc. No. 13) Ex. I.D. at 104-05.) On February 2, 1996, Edward again wrote to

his sons. Edward wrote, "This is a follow up and revision of my letter dated . . . Feb. 1 .

. . ." He first summarized his February 1, 1996 proposal in a chart form:

Basic data:
Legal Allocation of Shares:
Louis 42%     Us 42%     Lily 16%

13

> Moral Allocation: Victor's wishes if Lily needs it:
> Louis 25%     Us 25%       Lily 50%
>
> My proposal as of Feb 1
> Louis 48%     Us 33%

(Id. at 106.)  Edward then continued:

> My Revised Proposal as of Feb. 2, 1996:
>
> At any time after Jan 1, 2000, when we feel a need for it, we are accorded
> the right to:
>
> (1) a single transaction buyout of only 25% of the totality of shares in order
> to leave the Company in possession of Lily's potential moral claim on 50%
> of the shares (This may agree with Louis' remarks on this subject in his letter
> of October 30, 1995)
>
> (2) We would not seek any further buyout of our shares until Lily's death.  At
> any time after that we have the right to a buyout of another 8% of the totality
> of all shares (bringing us to the 33% level that I have already committed to
> accept) PLUS the value of any share bequeathed to us in Lily's will.
>
> (3) If Lily does receive any money from the Company (beyond dividends on
> the 16% of the totality off (sic) shares that she legally owns), then one half of
> that amount would be subtracted from what is due to us under paragraph (2)
> immediately above. . . .
>
> I apologize for burdening you with all this.  But it is clear that Louis and I do
> not seem to be able to stay on the same wave length in these negotiations,
> and it would be better for our relationship if I bowed out.

(Id. at 106-07.)  Louis wrote to Edward on February 7, 1996:

> I received your letter of January 25th after your telephone call . . . .
> Your offer to reduce the value of your shares is very generous.  It make (sic)
> the financing that much easier.  By that time maybe we will be able to find a
> way to engineer a reduction of the expenses and taxes.
>
> Please inform me if the delay of buying-out your shares creates a
> financial problem for you.  In that case I can look for a way of advancing you
> money.
>
> In regards to Lily's interests Dad expressed the wish that 50% be
> reserved for her.  I would think, however, that in three years, if her situation
> has not changed, one third would be sufficient to cover any eventuality.
> What is your opinion?

(Busch Decl. (Doc. No. 123) Ex. VII.H at 49.)  In a letter dated February 9, 1996,

Edward wrote to Louis:

> This is a follow up on my letter dated Feb 7th or 8th.  I want to get back to the personal relationship that existed between us before these negotiations seemed to go sour.  At that time you trusted me, and I trusted you.
> Joel will be making proposals toward that end.  If we both share that goal, it is inconceivable to me that we cannot succeed.

(Id. at 52.)

Edward apparently met with Joel and Ethan in New York in February 1996.  (See

id. at 51.)  In a document dated February 12, 1996 and titled, "Items for discussion in

New York," Edward wrote (apparently to his sons):

> I have been thinking about the contents of Louis' long and angry letter of Jan. 18.  A few things finally penetrated my mind.  First, I had never really appreciated the magnitude of the effort that he has devoted over the last twenty five years to converting Netherhall Gardens (one of the houses containing 8 apartments) from a zero profit rent controlled enterprise into a high profit operation.
>
> This has required a lot of work. . . .
> . . . .
> These tasks are not things that in England could at that time have . . . been delegated to managing agents.  Their charges were high and their level of effort was minimal.
>
> Moreover, during the last ten years of Miriam's life he had to manage all her financial affairs . . . .
> And for the last fifteen years he has in effect, had to serve as a parent for Lily, who was until about a year ago, subject to a variety of crises, including hunger strikes. . . .
>
> All this time I sort of took all these chores for granted.  Since I was too far away to help, it did not really occur to me that he was carrying an unusual burden.  This means that, with respect to the properties, he created the increase in their value, and I was just a detached shareholder.  My number might be 42% of the shares, but my contribution to their value was zero.
> . . . .
> The implications of all of this are:

(1) My 42% of the shares grossly overstates my entitlement, I have contributed zero to their value, and have not contributed significantly to the tasks of helping my mother . . . or Lily.

. . . .

For these reasons, and to restore my original good relationship with Louis, I suggest that:

(1) I limit my claim to 25% of the gross asset value of the Company minus the reasonable tax and other costs of converting that gross 25% into the net amount of cash payable to me for my shares.

(2) My rough guess is that, as of now, the gross 25% is about 300,000 pounds, and that the net amount would be about 225,000 pounds (close to 350,000 dollars)

(3) If I limit myself to this amount, they will four to five years from now, be able to buy me out with their reserves in cash and securities, (or with these reserves and by borrowing a relatively modest sum secured by a mortgage).

. . .

. . . .

So we have a situation where they can both buy me out and still retain ownership of both properties. . . . If I limit myself to 25%, they become responsible for all expenses for Lily implicit in Victor's request.  In other words, this will be an issue that does not have to be negotiated between us.

. . .

. . . .

(6) If dividends are paid to us in the interim, that should count toward the total that we will have a claim to, since I can invest them advantageously, and they will grow in value at a reasonable rate, even if it is a little less than what might accrue if left with the Company.

(Busch Decl. (Doc. No. 124) Ex. VII.I.1 at 6-10.)  On February 22, 1996, Edward's sons

sent Edward's proposal to Louis by facsimile.  (Busch Decl. (Doc. No. 123) Ex. VII.H at

53-56.)  In their cover page, they note:

It was striking talking to Ed how close his main concern was to yours—he was very upset that the two of you had quarrelled and therefore anxious to resolve this on any terms simply to put the quarrel behind him.

Ed is also very mindful not only of what you've done to create the value of the property, but over the years in managing Miriam's, Lily's, Florence's affairs. He wondered whether his gift of shares to you was sufficient (not a gift really but a compensation for all of the above).

(Id. at 53.)  The attached proposal states in part under the heading, "In General," that:

16

The risks and rewards implicit in this arrangement seem to balance.  Lou risks that the value of the company will decrease between now and the time of purchase, which he commits to making for a fixed amount.  This is balanced by Ed's forfeiture to Lou of the difference in value if it should increase.

(Id. at 55.)

On March 17, 1996, Louis wrote to Edward and Edward's sons:

This letter confirms the verbal agreement I gave you over the phone as to the terms of the Fax of February 22nd, but here are several minor points to be clarified.

Note that it is . . . "Compayne Ltd.," which will be buying back the shares, not our family as mentioned in your Fax.  Another detail, Ed's 4126 shares is exactly 41.6% of total shares.  In the instructions I gave to Mr. Ericsson I assumed that the percentage retained as Ed's continuing interest in the company would be 7.6% instead of 8%.  Is this O.K.?
. . . .
. . . . Your Fax stated that Ed will sell 2480 shares (25%) for £280,000 (£300,000 minus, approximately, the dividends distributed up to that date. . . .

You raised two points in your Fax, date of buy-out and current value.  We suggest that the transaction takes place in January or February, 1999.  Is this O.K.?  As to the current value, you proposed £300,000 in your Fax.  Do you still agree to this?

Our agent, Mr. Arnold, gave a professional estimate (we paid him a substantial fee for his work) of the property value based on current values of similar apartments in the same area.  (Ed has a copy) which he documented fully.  We can ask for other evaluations each one of which I assume would be different, some more, others less.  The only way to have a relatively firm figure would be to put up . . . the property for sale and go through with a 'bad-faith' negotiation process with potential 'buyers'.  As you say in your Fax the risks are spread more or less evenly over the two parties.  You should clarify your position on this point.

(Id. at 59-60.)  On May 9, 1996, Louis wrote to Ed:

You want to modify the proposition you made to us on February 22nd in order to reduce your capital gains taxes.  You propose that the gift of 9% of the shares that you offered to our family in recognition of the results we have obtained with Compayne, be included in the buy-back instead of being

17

directly transferred as a gift to our children.  You would sell 34%, 3373 shares, instead of 25%, 2480 shares, for the same amount, £300,000 minus the dividends distributed to you up to that date, i.e. approximately £280,000.
. . . .
This appears surprising. Let me explain.  Shares bought back by a company are dissolved.  This means that the current number of total shares, 9920, in the company will be reduced by the number of shares the company buys back from you.  In your new proposition to sell back 3373 instead of 2480 shares, the gift packet of 9%, 893 shares, is distributed among all the shareholders instead of only to our children as per your February proposition.  The impact on the value of these holdings is magnified because the total number of shares being reduced, the value of each share is increased, all other things being equal.

(Id. at 61.)  On May 23, 1996, Edward's son, Ethan, replied:

I was unaware until recently of Ed's capital gains concerns, and so never passed them on to you, and I was totally ignorant until your last letter of the fact that the company erased the shares it bought back, with all the consequences flowing from that.
. . . .
As you know, Ed's only concern is security—that he be able to count upon a certain amount of money by a certain date.
. . . .
[Ed proposes that he retain no shares.  That is, for the agreed upon sale price, the company shall be buying back all of Ed's shares.  This then will give Ed his expected buy-out price and his desired tax consequences, and will prevent him only from enjoying a later advantage that he never sought anyway.]

(Id. at 64-65.)[2]  On July 3, 1996, Louis wrote to Ed:

---

[2] According to Plaintiff, the above bracketed text appears in the signed May 23, 1996 letter provided by Louis Coen through discovery but different text appears in the version of the May 23, 1996 letter maintained by Plaintiff.  Plaintiff's unsigned version has handwritten marks on it, which read : "Mailed to Louis pretty much as is, and with minor revisions" and the text "Joel and Ethan's draft."  (FAC (Doc. No. 13) Ex. I.D at 174.)  In place of the bracketed text, Plaintiff's unsigned version reads:
Therefore, let me suggest the following.  If you do upon reflection feel that there is inequity in Ed's request considering the deal overall, you compensate yourself from Ed's remaining 7.6% of the shares.  That is, for the agreed-upon sale price, you shall receive from Ed not 34% of the shares, but whatever portion between 34% up to an[d] including 42%, that you deem appropriate.

18

You say that you are perfectly co[m]fortable with the terms of Ethan's letter of May 23rd despite the fact that our kids feel it is over generous. . . . We assume, therefore, that the terms in the letter from Joel and Ethan of May 23rd are final, and that we can now invest, more profitably, the cash we have in the bank so that . . . in January 1999 we will be in a better position to buy out all of your shares for £300,000 minus the interests paid out to you up to that date.

(Id. at 66-67.)  Edward and Rena wrote back to Louis on July 15, 1996:

Let's just stay with Ethan's letter and forget about any gifts.  That keeps things clean and simple and is totally O.K. with me.  So you can invest on that assumption.  I am getting advice here on the tax issues.  But whatever that turns out to be, the deal is still firm.

(Id. at 68.)  On June 11, 1998, Compayne's accounting firm sent Edward a letter indicating that, less dividends paid, Edward would receive £292,088 in exchange for all of his shares of stock in Compayne.  (Id. at 69.)  On March 31, 1999, Edward and Compayne executed an agreement for the purchase of all of Edward's 4126 shares for £285,843.61.  (Busch Decl. (Doc. No. 12) Ex. I.B. at App. Tab 4 § 2.)  Plaintiff refers to this sale as "The 1999 Transaction."  (FAC (Doc. No. 12) Ex. I.B. Part I.)

## C.    Plaintiff's Jurisdictional Allegations

As noted above, Plaintiff filed this action on March 21, 2005 and the operative FAC on July 10, 2005.  (Doc. Nos. 1, 43.)  Plaintiff's FAC contains the following subject matter and personal jurisdiction allegations:

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because of diversity of citizenship and 28 U.S.C. § 1332(b) as each of the Defendants, save for Defendants John Doe One and John Doe Two who are residents of a State other than the State of Minnesota, is a resident

---

For purposes of Defendants' motion to dismiss, the Court adopts Plaintiff's version as the one either received by Louis Coen and/or believed to have been received by Louis Coen by Edward Coen.  The Plaintiff's version, however, does not alter the Court's ultimate determination on Defendants' motion.

of a foreign state.  Further, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of the existence of several federal questions raised in this Complaint.  The Court also has jurisdiction over this action pursuant to 18 U.S.C. § 1341, because of Mail Fraud, and 18 U.S.C. § 1343, because of Wire Fraud.  This Court has pendant jurisdiction over the claims arising under state law pursuant to 28 U.S.C. 1338(b). The amount in question herein exceeds $75,000.00.

2. This Court has personal jurisdiction over each of the Defendants.

(FAC at 4-5.)

Specifically, Plaintiff claims that jurisdiction is proper over Louis Coen, Daniel Coen, Anita Ariella Coen, Carole M. Coen, Nicholas Clark, Peter Bunker, Compayne, the Trustees of the Victor Coen Will Trust, Miriam Coen Will Trust, and Lily Coen Estate because they have allegedly:

(1) conducted a business transaction, comprised of The 1992 Transaction or The 1999 Transaction, either directly or through an agent from outside of the State causing injury to property within the State; (2) caused injury to personal property within the State; (3) deceived Mr. Edward Coen, either directly or through an agent, within the State causing injury to a citizen and resident of the State of Minnesota; and (4) appeared, by Local Counsel, before a Court of the State of Minnesota in a matter related to and part of the present action.

(Id. at 5-7.)

Plaintiff further alleges that jurisdiction is proper over Louis, Daniel, and Carole Coen because they allegedly "traveled to and within the State of Minnesota."  (Id. at 5-6.)[3]  Finally, Plaintiff alleges in a chart exhibit that personal jurisdiction is proper over

---

[3] At oral argument, Plaintiff's counsel, Nathan A. Busch, argued that Daniel and Carole traveled to Minnesota to attend the May 19, 1996 wedding of Busch and Plaintiff. Defendants have previously represented to the Court (in a different action) that Louis Coen has resided in France since shortly after World War II but has traveled to Minnesota most recently in July 1999 to attend Edward and Rena's fiftieth-wedding anniversary, in September 2001 to visit Rena in the hospital, and in October 2001 to attend Rena's funeral.  (FAC (Doc. No. 45) Ex. III.A.)

certain defendants on certain claims based on what she refers to as the <u>Aftanase</u> test, which, while not cited in her response brief, presumably refers to <u>Aftanase v. Economy Baler Co.</u>, 343 F.2d 187, 197 (8th Cir. 1965), a case in which the Court of Appeals for the Eighth Circuit adopted a five part test for determining whether in personam jurisdiction exists.  (Busch Decl. (Doc. No. 127) Ex. VII.P.3.)  In her chart, Plaintiff also states that, given the chance, she would amend her FAC to allege some of her existing claims against named Defendants not currently identified with those claims.  (<u>Id.</u>)

## II.   PARTIES' POSITIONS

Plaintiff's response brief argues that personal jurisdiction is proper over Defendants because the effects of the fraud by intentional misrepresentation which she levels at all of the named Defendants except the trustees of the Victor and Miriam Coen Trusts (Doc. No. 127 Pl.'s Ex. VII.O.1) were felt in Minnesota.  (Pl.'s Response at 7-16.) Plaintiff contends that jurisdiction exists over Defendants under what is known as the "effects" test, a test for determining whether personal jurisdiction exists in cases where the defendants are accused of committing intentional torts as first described in <u>Calder v. Jones</u>, 465 U.S. 783 (1984).  (Pl.'s Response at 7.)

> In <u>Calder</u>, Shirley Jones sued Calder and others in California for libel stemming from an article appearing in the tabloid National Enquirer.  Calder, president and editor of the Enquirer, was a Florida resident and had only been to California [where the Enquirer had a substantial percentage of its national circulation] twice, both times on unrelated matters.  The <u>Calder</u> Court, approving of the effects test used by the lower court, held that personal jurisdiction in California existed even though the article had been written and edited in Florida and Calder's visits to California were unrelated to the suit.  However, it was more than mere effects that supported the Court's holding.  The Court found that Calder intentionally aimed his tortious action at California and could, therefore, have "reasonably anticipate[d] being haled into court there."

Hicklin Eng'g, Inc. v. Aidco, Inc., 959 F.2d 738, 739 (8th Cir. 1992) (per curiam) (quoting

Calder, 465 U.S. at 790).

Plaintiff contends that Defendants intentionally misrepresented three material

facts to get Plaintiff's father, Edward Coen, to sell all of his Compayne shares for far

less than their actual worth.  Those facts concern:

> (1) the fraction of the "asset value" of Compayne to which Lily [Coen,
> Plaintiff's aunt] was entitled;
> (2) the "asset value" of Compayne; and
> (3) the fraction of the "asset value" of Compayne . . . Edward [Coen] could
> have access[ed].

(Pl.'s Response at 7.)  Plaintiff claims that these three factors were the key reasons

Edward Coen made the decision to sell his shares for around £300,000.  (Id.)  Because

the first and third claimed misrepresentations concern Lily Coen's interest in Compayne

under the Victor Coen Will, the arguments concerning each are considered together.

### A.  Lily Coen's Interest in Compayne Under the Victor Coen Will

First, Plaintiff argues that before December 21, 1995, "Edward evidently believed

that Lily was entitled to a fraction of the 'asset value' of Compayne equal to her

percentum shareholding in Compayne, which was about 16.7%."  (Pl.'s Response at

11.)  Plaintiff claims that Louis Coen intentionally misrepresented in his January 18,

1996 letter that Lily Coen was "'entitled'" to call upon 50% of Compayne" at a time when

Plaintiff claims Louis Coen knew that Lily Coen was not entitled to any of the asset

value of Compayne under the terms of the Victor Coen Will.  (Id.)  Plaintiff argues that

Louis Coen's misrepresentations about Lily's interest in Compayne stemming from the

Victor Coen Will led Edward to believe that he could not sell more than half of his 4126

shares.  (Id. at 16.)  Plaintiff further argues that when Louis Coen stated in his February

7, 1996 letter to Edward, "In regards to Lily's interests Dad expressed the wish that 50%

be reserved for her," Louis was under an affirmative duty to qualify this statement by

indicating that the stated fraction was 50% of the estate of Victor Coen and not 50% of

Compayne.  (Id.)  Plaintiff contends that the "record demonstrates that Louis and

Compayne, as well as Daniel, had uninhibited access to the documents relevant to" the

intentional misrepresentations of Lily's interest and the resulting fraction of "asset value"

accessible by Edward.  (Id. 16-17.)

Defendants respond that Edward repeatedly described Lily's interest in the

Compayne shares as a "moral claim."   Defendants cite to Edward's February 1, 1996

letter to his sons in which Edward writes that his 33% buyout proposal, "suggests what

may be a feasible and fair arrangement for safeguarding Lily's moral claim on 50% of

the Company's assets to the extent that she may need it."  (Defs.' Reply at 7 (citing

Doc. No. 13 at 101.))  Defendants also cite Edward's revised proposal of February 2,

1996 in which Edward proposes he receive payment for only 25% of the total shares of

Compayne "in order to leave the Company in possession of Lily's potential moral claim

on 50% of the shares (This may agree with Louis' remarks on this subject in his letter

dated October 30, 1995)."  (Id. (citing Doc. No. 13 at 106.))  Defendants argue:

> The parties discussed a variety of ways of meeting what they viewed as a
> joint moral obligation, including the possibility of Edward retaining some
> percentage of shares subject to potential contribution to Lily in the event it
> was needed.  In the end, Edward proposed that he sell all of his 4126 shares
> at a price named by him and this became the agreement.  Edward's interest
> in Compayne was not diminished in any way by a "legal" or "moral"
> entitlement on Lily's part.

(Id.)  At oral argument, Defendants also argued that by agreeing to only 25% of the

value of Compayne in exchange for all of his shares, Edward had written on February

23

12, 1996 that Louis' family would "become responsible for all expenses for Lily implicit in

Victor [Coen's] request.  In other words, this will be an issue that does not have to be

negotiated between us. . . ."  (citing to Doc. No. 124 at 8.)

     **B.**    **"Asset Value" of Compayne**

     Plaintiff also argues that Louis Coen committed intentional fraud by representing

to Edward that the "asset value" of Compayne on March 17 and May 9, 1996 was

£1,200,000.  (Pl.'s Response at 15.)  Plaintiff argues that Louis represented in his

March 17, 1996 letter that "Our agent, Mr. Arnold, gave a professional estimate (we paid

him a substantial fee for his work) of the property value based on current values of

similar apartments in the same area (Ed has a copy) which he documented fully."  (Id.

(citing Doc. No. 123 at 60.))  Plaintiff also cites Louis' letter to Edward on May 9, 1996 in

which Louis wrote, "We have estimated that the company's worth in three years time will

be approximately £1,100,000 taking into account the outgoings—dividends, buy-back

costs, and taxes, and the net income. . . . To make a true comparison we have to

assume, that the properties have the same real estate value as today."  (Doc. No. 123

at 63.)  Plaintiff contends that the true "asset value" of Compayne's real estate holding

on March 11, 1996 "was approximately £2,575,000."  (Pl.'s Response at 14.)  Plaintiff

cites to a November 2004 valuation study of Compayne's real estate holdings

commissioned by Plaintiff in which the evaluator proffered an opinion on the value of

those holdings as of March 11, 1996.  (Id.)  Plaintiff contends that the "record

demonstrates that Louis and Compayne, as well as Daniel, had uninhibited access to

the documents relevant to" the true "asset value" of Compayne.  (Id. at 16-17.)

     Defendants respond that "[a]t the end of 1994," when Edward Coen was still a

director of Compayne, "Louis Coen provided Edward Coen with an estimated current value of Compayne's two buildings, which was prepared by Martin Arnold & Co. Ltd. 'for internal accounting purposes for your company and its shareholders only.'" (Defs.' Reply at 4 (citation omitted.))  According to Defendants, "Louis Coen discussed the limitations of the appraisal and noted that Edward might want to obtain his own evaluation: 'Another issue is how and who should make the evaluation of the property at the time you decide to liquidate your shares.  This costs[,] I believe, a substantial amount of money unless Mr. Arnold does it.  [He] is not, however, an 'expert.'"  (Id. (citing Louis' December 27, 1994 letter to Edward.))  Defendants further argue that Louis wrote to Edward on January 18, 1996 summarizing the conclusions he thought both Louis and Edward had agreed on at the New York meeting: "We foresaw that the property values would probably rise in the future in Hampstead. . . . Assuming these are correct assumptions no one has an advantage in rushing into a sale of property."  (Id. (citing Doc. No. 123 at 42.))  Defendants contend that it was Edward who after "'further thought' . . . rejected Louis' bullish opinion, stating, 'I am not as confident that we can count on a substantial increase in its value in the short term.  One reason is that the market can go down as well as up.'"  (Id. at 4-5 (citing Edward's December 21, 1995 letter to Louis.))  Defendants contend that the correspondence between Edward (and his sons) and Louis demonstrates that Louis wanted to postpone Edward's buy-out but that Edward and his sons "remained insistent upon selling . . . and . . . proposed to fix the price of the transaction in 1996 at £300,000 (with the actual purchase occurring three years later.)"  (Id. at 5.)  Defendants contend each side bore risks in setting the price so far in advance of the sale as is demonstrated by the February 22, 1995

facsimile Edward's sons sent to Louis in which they wrote:

> The risks and rewards implicit in this arrangement seem to balance.  Lou risks that the value of the company will decrease between now and the time of purchase, which he commits to making for a fixed amount.  This is balanced by Ed's forfeiture to Lou of the difference if it should increase.

(Id. (citing the February 22, 1995 letter.))  Defendants also argue that Louis suggested to Edward on March 17, 1996 that other evaluations could be requested but that on May 23, 1996, Edward's son Ethan Coen wrote to Louis that "Edward proposes that he retain no shares.  That is, for the agreed-upon sale price, the company shall be buying back all of Ed's shares."[4]  (Id. at 6.)  Defendants argue that the "correspondence reveals the antithesis of fraud: Louis Coen expressing the opinion that the value of the properties was likely to increase and urging Edward not to sell."  (Id.)  Additionally, Defendants argue:

> The correspondence also makes evident that there were numerous non-monetary factors considered by both Louis and Edward in connection with the transaction.  Edward's desire for security, liquidity and favorable tax consequences were important factors.  Perhaps the "main concern" of both brothers throughout, however, was a strong desire not to tear asunder the bonds of brotherly affection between them.

(Id.)

Defendants further contend that, "[e]ven if Plaintiff could establish a 'prima facie' claim" of intentional fraud, "the focal point" of the fraud for purposes of the Calder "effects" test was not Minnesota because Louis Coen did not purposefully direct any activity toward Minnesota but, instead, was responding to a shareholder's request to cash out his Compayne shares.  (Id. at 7-8.)  Defendants contend that personal

---

[4] Plaintiff disputes this is what Edward believed was in the text of the May 23, 1996 letter.  See supra note 1.

jurisdiction over any of the other Defendants is derivative of Louis' actions or based on actions taken merely as a result of their status as shareholders of Compayne.  (Id. at 8-9.)

At the hearing on the motion, Plaintiff argued that it is irrelevant to the application of the Calder "effects" test who initiated contact or who was the primary aggressor. Plaintiff further claimed that it is undisputed that the final proposal for the conveyance of Edward's 4126 shares was drafted on the computer owned by Edward Coen on May 23, 1996 and that this action imbues this Court with specific jurisdiction over at least some of the Defendants.  Plaintiff also argued that the Court must apply the Due Process analysis of the Fifth, and not the Fourteenth, Amendment because its claims are in federal court because of federal question jurisdiction.  Plaintiff contends that the relevant geographical extent of the forum under the Fifth Amendment personal jurisdiction analysis is the entire United States and it is uncontroverted that Defendants Mr. Louis Coen, Mr. Daniel Coen, and Compayne . . . met with Mr. Edward Coen, Mr. Joel Coen, and Mr. Ethan Coen in New York in early December, 1995, to discuss the conveyance of the 4126 shares from Mr. Edward Coen.  Therefore, according to Plaintiff, Louis, Daniel, and Compayne, were physically present in the forum for purposes of the Due Process analysis.  Finally, at the motion hearing, Plaintiff argued that the brunt of the injury alleged was sustained in Minnesota because Edward was in Minnesota when he conveyed his shares of Compayne for far less than their actual worth.

III.   **DISCUSSION**

A.   <u>**Standard of Review**</u>

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that [the defendants] can be subjected to jurisdiction within the state.  Once jurisdiction ha[s] been controverted or denied, [the plaintiff] ha[s] the burden of proving such facts.'" <u>Dever v. Hentzen Coatings, Inc.</u>, 380 F.3d 1070, 1072 (8th Cir. 2004) (quoting <u>Block Indus. v. DHJ Indus., Inc.</u>, 495 F.2d 256, 259 (8th Cir.1974) (internal citation omitted), <u>cert. denied</u>, 543 U.S. 1147 (2005).  "When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings.  <u>Stevens v. Redwing</u>, 146 F.3d 538, 546 (8th Cir. 1998) (citing <u>Land v. Dollar</u>, 330 U.S. 731, 735 n. 4 (1947) (noting that "when a question of the District Court's jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as they exist" and "the mode of its determination is left to the trial court")).[5]  In fact, where, as here, a defendant challenges personal jurisdiction with affidavits or documents:

> The plaintiff's "'prima facie showing' must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." <u>Id.</u> at 260; <u>see also</u> <u>Davis v. St. John's Health Sys., Inc.</u>, 348 Ark. 17, 71 S.W.3d 55, 57 (2002) ("If the complaint does not allege

---

[5] "While in some cases it is more appropriate to test jurisdictional facts upon the proof adduced after full discovery, the court may properly address itself to the jurisdictional issue at any earlier stage of the proceedings where the affidavits and other exhibits presented on motion and opposition thereto make the issue ripe for early determination." <u>Block Industries v. DHJ Industries, Inc.</u>, 495 F.2d 256, 259 n.3 (8th Cir. 1974) (citations omitted).  Here, the Court has provided sufficient discovery opportunities for Plaintiff to have uncovered prima facie evidence of personal jurisdiction over Defendants.  This is especially true in light of the tome-like FAC and its reams of incorporated exhibits.

sufficient facts on which personal jurisdiction can rest, then the complaint is
factually deficient.    Mere conclusory statements devoid of a factual
foundation do not suffice in this inquiry.") (internal citation omitted); <u>Jet</u>
<u>Charter Serv., Inc. v. W. Koeck</u>, 907 F.2d 1110, 1112 (11th Cir.1990) ("When
a defendant raises through affidavits, documents or testimony a meritorious
challenge to personal jurisdiction, the burden shifts to the plaintiff to prove
jurisdiction by affidavits, testimony or documents."); <u>Taylor v. Portland</u>
<u>Paramount Corp.</u>, 383 F.2d 634, 639 (9th Cir.1967) ("We do not think that the
mere allegations of the complaint, when contradicted by affidavits, are
enough to confer personal jurisdiction of a nonresident defendant. In such a
case, facts, not mere allegations, must be the touchstone.")

<u>Id.</u> at 1072 -1073.  In this context, a plaintiff has presented a "prima facie case" of

jurisdiction over the defendant "if there is any genuine issue as to any fact material to

the jurisdictional question."  <u>Radaszewski v. Telecom Corp.</u>, 981 F.2d 305, 309 (8th Cir.

1992), <u>cert denied</u>, 508 U.S. 908 (1993).

As the Eighth Circuit has stated:

This is the same standard as the one we apply on motions for summary
judgment under Rule 56.  We look at the facts in the light most favorable to
the party opposing the motion, give him the benefit of all reasonable
inferences, and grant the motion only if there is no genuine issue as to any
material fact, so that the moving party is entitled to judgment as a matter of
law.  So here, though the motion is captioned under Rule 12(b)(2) rather than
under Rule 56, the analytical process is the same as that used on a motion
for summary judgment.   We look at the facts relevant to the issue of
jurisdiction in the light most favorable to [the plaintiff], give him the benefit of
all reasonable inferences from these facts, and deny the motion to dismiss
if the record, viewed in this way, raises any genuine issue of fact material to
the issue of jurisdiction.

<u>Id.</u> at 310.

### B.    **Due Process and Personal Jurisdiction**

This Court has personal jurisdiction over a foreign defendant if a state court in

Minnesota would also have jurisdiction.  <u>See</u> <u>Digi-Tel Holdings, Inc. v. Proteq</u>

<u>Telecomm. (PTE), Ltd.</u>, 89 F.3d 519, 522 (8th Cir. 1996).  Minnesota's reach over

foreign defendants extends to the fullest extent permitted by the United States

Constitution.  See Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526,

528 (8th Cir. 1991) (citing Rostad v. On-Deck, Inc., 372 N.W.2d 717, 719 (Minn. 1985)

(en banc), cert. denied, 474 U.S. 1006 (1985)).

 "[T]he constitutional touchstone [of personal jurisdiction] remains whether the

defendant purposefully established 'minimum contacts' in the forum State."  Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington,

326 U.S. 310, 316 (1945)).  "Th[e] 'purposeful availment' requirement ensures that a

defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,'

or 'attenuated' contacts."  Id. at 475 (citations omitted).  Thus, for the Court to acquire

jurisdiction over a non-resident defendant, the defendant's contacts with Minnesota

"must be sufficient to cause the defendant to 'reasonably anticipate being haled into

court'" in Minnesota.  Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648 (8th Cir.

2003) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

 The Eighth Circuit considers the following factors in determining whether

personal jurisdiction is proper: (1) the nature and quality of the contacts with the forum

state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of

action to the contacts; (4) the interest of the forum state in providing a forum for its

residents; and (5) the convenience of the parties.  Dakota Indus., Inc. v. Dakota

Sportswear, Inc., 946 F.2d 1384, 1390 (8th Cir. 1991).  The first three factors are

primary factors, the remaining two are secondary factors.  Id.  The Court looks to all of

the contacts in the aggregate and examines the totality of the circumstances in making

its determination.  Northrup King. Co. v. Compania Productora Semillas Algodoneras,

S.A., 51 F.3d 1383, 1388 (8th Cir. 1995).

The third factor, the relation of the cause of action to the contacts, distinguishes whether the jurisdiction is specific or general. See Digi-Tel Holdings, Inc., 89 F.3d at 522 n.4. "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose." Id.

Finally, "[e]ven if the minimum contacts threshold is established, personal jurisdiction may be defeated if its exercise would be unreasonable considering such factors as (a) the burden on the defendant; (b) the interest of the forum State; (c) the plaintiff's interest in obtaining relief; (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (e) the shared interest of the several states in furthering fundamental substantive social policy." St. Jude Medical, Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 591 (8th Cir. 2001) (citing Asahi Metal Indus. Co., Ltd. v. Superior Court, 480 U.S. 102, 113-14 (1987)). Where personal jurisdiction over foreign defendants is sought, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Asahi, 480 U.S. at 114.

C.     **No Personal Jurisdiction Exists Over Defendants**

As an initial matter, the Court notes that Plaintiff does not contend in her brief and did not contend at oral argument that general personal jurisdiction exists over any of the named Defendants and the Court finds that no such jurisdiction exists.  The

31

named Defendants are all residents of foreign countries with limited contacts to this

forum.[6]   Therefore, the question for the Court is whether <u>specific</u> in personam

jurisdiction exists over Defendants, whether by application of the <u>Calder</u> effects test or

some other gauge of the constitutional due process touchstone that a defendant's

contacts with Minnesota "must be sufficient to cause the defendant to 'reasonably

anticipate being haled into court'" in Minnesota.   <u>Epps</u>, 327 F.3d at 648 (citations

omitted).[7]   "Where specific personal jurisdiction over a non-resident is asserted, due

_____

[6] As noted above, Plaintiff's FAC does make some general allegations that Louis, Daniel, and Carole Coen have traveled to Minnesota.  The Court finds these allegations insufficient to assert general jurisdiction over these Defendants.  Nor is the Court persuaded by Plaintiff's FAC allegations that the Defendants somehow waived their personal jurisdiction objections by appearing by local counsel, "before a Court of the State of Minnesota in a matter related to and part of the present action."  (FAC at 5-7.) It is not clear to the Court what "matter" Plaintiff is referring to, how it was related, or when it occurred.  Thus, the Court finds Plaintiff has not met her burden to proffer evidence to support this allegation.  In any case, the Court is not persuaded, given Defendants' timely and consistent objections to personal jurisdiction in this case, that Defendants waived any personal jurisdiction objection in making appearances in other matters.

[7] To the extent that Plaintiff is correct that the due process analysis applied here should be conducted in light of the Fifth Amendment rather than the Fourteenth Amendment, the Court finds that the relevant forum for analyzing Defendants' contacts in this case remains the State of Minnesota and not the nation as a whole.  <u>See Dakota Industries, Inc. v. Dakota Sportswear, Inc.</u>, 946 F.2d 1384, 1389 (8th Cir. 1991) ("Although the Supreme Court has defined the 'minimum contacts' standard in the context of diversity jurisdiction, and it is clear that Congress can authorize nationwide service of process in federal question cases without offending due process, we nonetheless apply the minimum contacts analysis here.  The fifth amendment is 'essentially a recognition of the principles of justice and fundamental fairness,' so it is appropriate that we examine the contacts with the forum <u>state</u>.") (citations omitted) (emphasis added); <u>see also</u>, <u>Zumbro v. Calif. Natural Prods.</u>, 861 F. Supp. 773, 777 n.8 (D. Minn. 1994) (noting that even where federal claims involving federally created rights are involved, "the standards under both amendments . . . are the same" for purposes of analyzing personal jurisdiction); <u>see e.g.</u>, <u>3M Innovative Prop. Co. v. Infocus Corp.</u>, Civ. No. 04-009 JNE/JGL, 2005 WL 361494, *1-*4 (D. Minn. Feb. 9, 2005) (analyzing only defendants' contacts with Minnesota when applying the law of the Federal Circuit where

process is satisfied if the defendant has purposefully directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1103 (8th Cir. 1996). Specific jurisdiction may exist even when "the nonresident's contacts are minimal, but the cause of action arises out of or is related to those contacts." KSTP-FM, LLC v. Specialized Commc'ns, Inc., 602 N.W.2d 919, 923 (Minn. Ct. App. 1999); see also Helicopteros Nacionales de Colombia, S.A., 466 U.S. at 414. Even a single, isolated transaction between a nonresident defendant and a resident plaintiff can be sufficient to justify exercising specific personal jurisdiction. See e.g., McGee v. Int'l Life Ins. Co., 355 U.S. 220, 221-24 (1957).

Where intentional tortious wrongdoing is present, courts may also apply the so-called "effects test" set forth in Calder v. Jones, 465 U.S. 783, 788-90 (1984). The Calder "'effects' test provides that the exercise of personal jurisdiction over a non-resident does not violate due process where 1) the defendant committed an intentional tort; 2) the plaintiff felt the brunt of the harm in the forum state, such that the forum state was the focal point of the tortious activity; and 3) the defendant expressly aimed the tortious conduct at the forum such that the forum state was the focal point of the tortious activity." Bible & Gospel Trust v. Wyman, 354 F. Supp. 2d 1025, 1030-31 (D. Minn. 2005).

Defendants attack Plaintiff's claim of specific personal jurisdiction under the Calder "effects" test on two fronts. First, Defendants argue that the focal point of

---

plaintiff had brought patent infringement claims.)

Defendants' actions occurred outside of Minnesota because Louis' communications with Edward were merely a result of Edward's status as a shareholder seeking to cash in his shares.  That is, Louis did not purposefully direct his actions toward Minnesota; he was responding to Edward's request for a buy-out.  (Defs.' Reply at 7-8.)  The Court agrees. While Plaintiff contends that there is no evidence that Edward initiated the buy-back of his shares, Plaintiff has presented no evidence to suggest that Defendants initiated the buy-back of Edward's shares.  Plaintiff has the burden to establish prima facie evidence of personal jurisdiction over Defendants.  Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 653 (8th Cir.1982).  The Court has conducted a thorough review of the correspondence between Edward Coen and Defendants from 1989 through to March 31, 1999 and makes the following findings.  The relevant correspondence does not begin until November 9, 1994, when Louis Coen states, "I understood in July that you [Edward] wanted to cash-in on your holding within the near future, so it is a sudden change that you want now to postpone it."  (Doc. No. 122 at 4.)  Louis is obviously responding to Edward's request to cash in his shares of a closely held corporation. Alone, Louis' or Compayne's response to Edward's proposal cannot be sufficient to establish an intent to commit a fraud with its focal point in Minnesota.  Furthermore, the Court finds that the successive letters from Louis to Edward or Edward's sons were either Defendants' continuing response to Edward's initial cash-out proposal or responses to Edward's successive cash-out proposals.  Again, these letters alone, do not constitute sufficient contacts with Minnesota whether under the traditional specific jurisdiction test or the Calder "effects" test, which still requires that a defendant expressly aim his tortious conduct at the forum such that the forum state was the focal

34

point of the tortious activity.  Bible, 354 F. Supp. 2d at 1030-31.

Moreover, despite Plaintiff's assertions, whether or not the nonresident defendant is the aggressor in a transaction is important in assessing personal jurisdiction.  Telex Commc'ns, Inc. v. Sanomed Medizintechnik, GmbH, Civ. No. 02-298 ADM/AJB, 2002 WL 31398725, *5 (D. Minn. Oct. 22, 2002) (citing Dent-Air Inc. v. Beech Mountain Air Serv., Inc., 332 N.W.2d 904, 907-08 (Minn. 1983); KSTP-FM, LLC v. Specialized Commc'ns, Inc., 602 N.W.2d 919, 924 (Minn. Ct. App. 1999) (holding that "where a nonresident defendant is an 'aggressor' in the transaction, it is more likely to have purposefully availed itself of the forum state's benefits and protection")).  While Plaintiff may be correct that personal jurisdiction can still exist over a defendant who was not the initial or primary aggressor where the defendant demonstrates a subsequent eagerness or aggression towards the plaintiff, here there is no evidence that Defendants were ever eager or aggressive in their relationship with Edward.  In fact, as Defendants point out, on a number of occasions, Defendants attempted to get Edward to delay the transaction or to reconsider his proposal because they were concerned his proposal was not in his own best interest.  Louis also commented on one occasion that he "did not ask for or even expect" Edward to reduce his share in Compayne (Doc. No. 122 at 16) and described Edward's January 25, 1996 proposal as "very generous" (Doc. No. 123 at 49) and his May 23, 1996 proposal as "over generous" (Doc. No. 123 at 66).  The Court finds that the record does not demonstrate that Defendants "intentionally aimed [their] tortious action at [Minnesota] and could, therefore, have "'reasonably anticipate[d] being haled into court [here].'"  Hicklin, 959 F.2d at 739 (quoting Calder, 465 U.S. at 790).

Second, Defendants contend that Plaintiff has not presented prima facie

35

evidence to support her allegations that Louis or any other defendant engaged in an

intentional tort against Edward.  (Id. at 8.)  To succeed on a claim for

fraud/misrepresentation, a plaintiff must show:

> (1) there was a false representation by a party of a past or existing material
> fact susceptible of knowledge;
> (2) made with knowledge of the falsity of the representation or made as of the
> party's own knowledge without knowing whether it was true or false;
> (3) with the intention to induce another to act in reliance thereon;
> (4) that the representation caused the other party to act in reliance thereon;
> and
> (5) that the [plaintiff] suffered pecuniary damage as a result of the reliance.

Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986).  To assess

whether Plaintiff has met her evidentiary burden under the Calder "effects" test, the

Court must determine whether, on the record now before the Court, Plaintiff sufficiently

sets forth prima facie evidence that Defendants committed an intentional tort.  Here,

Plaintiff contends the evidence she has offered demonstrates (1) that at least Louis,

Compayne, and Daniel intentionally misrepresented Lily's interest in Compayne and the

resulting fraction of "asset value" accessible by Edward; and (2) the Defendants

intentionally misrepresented the true "asset value" of Compayne in 1996.  The Court

finds that Plaintiff has not produced prima facie evidence of either of these allegations.

The Court agrees with Defendants that the record is devoid of evidence that

would suggest Defendants represented to Edward that Lily was legally entitled to any

more of the "asset value" of Compayne than that represented by her 1666 shares of

Compayne.  Plaintiff relies on Louis Coen's statements in letters dated January 18,

1996 and February 7, 1996 that (1) in "papers concerning" Victor Coen's will, Victor

"wanted that 50% of his estate . . . be put aside in case of need by Lily"; (2) the cash-out

36

discussions had "forgotten the terms of Victor's will" and concerned disposing of Lily's

money; (3) the considerations of Lily's interest foreclosed Edward or Louis selling more

than ½ of their shares; (4) the cash-out deal should "cash in on as many shares as

possible without infringing on Lily's interests"; and (5) that Victor had expressed the

wish that 50% of the shares or assets of the company be held for Lily.  (Doc. No. 123

correspondence dated January 18, 1996 through February 7, 1996.)  Plaintiff claims

that these statements show Defendants' intentional intent to convince Edward that he

could not "access" the full value of his shares.  But the record belies this conclusory

allegation.  There is no indication that Edward believed he was <u>legally</u> restricted by Lily's

interest.  For example, Plaintiff has attached as an exhibit to her FAC, an August 25,

1989 letter from Louis to Edward, in which Louis states:

> Last time we talked to each other on the phone I talked to you about Lily's stake in Dad's will which leaves us in control of practically the whole inheritance.  He asked us, however, to put aside 2/3 of the capital and income for her in the eventual case that she recovers. . . . [H]is wishes are clear.  We two are respons[i]ble to use this money, if it is needed, to assure Lily's needs if she recovers.  The income, however, which she doesn't use should be divided among us two according to Dad's wishes.  Unless, however, Lily recovers she will remain in the position of not needing nor even being able to use this income, let alone the principal.
>
> <u>Although Dad put no legal constraints on us</u>, our obligation is very clear that if she, miraculously, can benefit from this money or a part of it to have a little happiness, then it is our responsibility as long as she lives, to keep the principal intact.

(Doc. No. 13 at 3 (attached to Complaint as Exhibit I.D. at 3.) (emphasis added.))  Louis

Coen's January 18, 1996 use of terminology is consistent with his sentiment, expressed

in 1989, that, while no legal constraints existed, Edward and Louis had a moral

obligation to uphold the wishes of their father that Lily be taken care of for the remainder

of her life.  Further, prior to January 18, 2006, Edward's cash-out proposal included taking less than the full value of his shares, gifting some portion of his shares to Louis, or both.  (See November 25, 1994, March 1995, and December 21, 1995 correspondence.)  On February 1, 1996, after Louis' representations about Lily's "interest," Edward wrote to his sons that a reduced cash-out amount "may be a feasible and fair arrangement for safeguarding Lily's moral claim on 50% of the Company's assets to the extent that she may need it."  (Doc. No. 13 at 101.)  In that same letter, Edward also wrote: "If it is legally feasible, we would, out of the total amount received by us, segregate our full potential obligation to Lily in an investment account," suggesting that Edward recognized it was not an absolute legal requirement to segregate the funds for Lily.  (Jan. 31, 1996 letter (emphasis added.))  On February 2, 1996, Edward expressly indicated that Lily had "16%" of the "legal allocation of shares" and a "moral allocation" of "50%" of the shares.  (Doc. No. 13 at 106.)  Moreover, Louis, in a letter dated February 7, 1996, stated to Edward, "I would think, however, that in three years, if [Lily's] situation has not changed, one third would be sufficient to cover any eventuality. What is your opinion?"  (Doc. No. 123 at 49.)  Regardless of the actual wishes of Victor Coen as set forth in his will, the Court finds that Plaintiff has not presented prima facie evidence that Louis intentionally misrepresented Lily's interest in Compayne.[8]

---

[8] Plaintiff's counsel has filed with the Court a fifty-five page declaration with the Court that begins:

> Since the First Amended Complaint was filed in July, 2005, evidence and analysis has become available to Plaintiff that provides factual support for Claim One with regards to the fraction of the "asset value" of the company to which Ms. Lily Coen was "entitled."  Plaintiff Dr. Deborah R. Coen believes that it would serve the interests of justice to allow her to amend the First

Further, there is no evidence in the record to suggest that Louis or any of the
other named defendants intentionally disguised or withheld the true asset value of
Compayne in 1996.  Louis disclosed that the Arnold valuation which was enclosed in
Louis' letter dated December 27, 1994 was <u>not</u> prepared by an expert.  (Doc. No. 122 at
17.)  Edward responded in a handwritten document: "Who should evaluate the
properties at such time as a division is requested?  That question has no easy answer
<u>perhaps we would be happy with any reasonably competent assessor</u>.  Does Ariella
have expertise in this area?  Or in choosing the person to assess property?"  The
correspondence later reflects that Louis foresaw that the real estate holdings of
Compayne would rise in value and argued, "no one has an advantage in rushing into a
sale of property."  (Doc. No. 123 at 42 (emphasis added.))  Fixing the price at £300,000
in 1996 was an idea supported by Edward because he apparently believed that the
"risks and rewards implicit" in setting a fixed price "seem[ed] to balance" because Louis

---

Amended Complaint to include new allegations of fact regarding the fraction
of the "asset value" of the company to which Ms. Lily Coen was "entitled."

(Busch Decl. (Doc. No. 128) at 1.)  While most if not all of the material referenced
therein is already in the record before the Court, in fairness to Plaintiff, the Court has
reviewed the declaration in its entirety and, for purposes of considering Defendants'
motion to dismiss, has deemed the allegations therein to be part of the FAC.  In the
declaration, Plaintiff's counsel states, "Plaintiff Dr. Deborah R. Coen believes
that the language of the Victor Coen Will must be interpreted such that, at minimum,
two-thirds of the assets contained in the Victor Coen Will Trust were to be retained by
the Trust for the benefit of Ms. Lily Coen."  The declaration takes fifty-five pages to state
the underwhelming conclusion that the Victor Coen Will Trust contained no assets and
thus, ultimately, Lily Coen only had a legal entitlement to "at maximum . . . 16.7% of the
"asset value" of the company, not the 50% as represented by Defendant Mr. Louis
Coen."  (<u>Id.</u> at 24.)  Whatever the true legal or moral claim, if any, by Lily, nothing in the
declaration demonstrates prima facie evidence that Louis Coen <u>intentionally</u>
misrepresented Lily's interest to Edward in an effort to defraud him.

risked the value of the property would decrease and Edward risked the value would

increase.  (Feb. 22, 1995 letter.)  When again on March 17, 1996, Louis suggested that

other evaluations of Compayne's value could be sought, Edward, through his son

Ethan, responded on May 23, 1996 that, "for the agreed-upon sale price" of £300,000

less other costs, "the company shall be buying back all of Ed's shares."  (Doc. No. 123

at 65.)  Finally, despite Plaintiff's urging that Lily's interest and the "asset value" of

Compayne were the only "dispositive" factors in Edward's decision to sell his shares for

less than their full value, the record is replete with Edward's uncontroverted statements

that he considered liquidity, tax consequences, Louis' contributions to the company,

Edward's minority shareholder status, and his desire to not complicate his personal

relationship with his brother in setting the price to be paid.  In a letter dated February 12,

1996, Edward estimated that the "net amount" he would receive for cashing in all of his

shares "would be about 225,000 pounds."  (Doc. No. 124 at 8.)  On March 31, 1999,

Edward Coen received £285,843.61 for his 2146 shares.  (Busch Decl. (Doc. No. 12)

Ex. I.B. at App. Tab 4 § 2.)

As a result of the above findings, the Court determines that Plaintiff raises no

genuine issue of fact material to the issue of personal jurisdiction.  Radaszewski, 981

F.2d at 310.  There is no evidence that Defendants expressly aimed any tortious

conduct at the forum such that the forum state was the focal point of the tortious activity

nor is there any evidence of intentional wrongdoing by Defendants.  Bible, 354 F. Supp.

2d at 1030-31.  Therefore, the Calder "effects" test does not aid Plaintiff in

demonstrating that this Court has personal jurisdiction over Defendants.

To the extent that Plaintiff argues that there is some other basis for specific

40

jurisdiction over Defendants, the Court has also reviewed the totality of the record for

such a basis on each of Plaintiffs' claims.  Because the first three factors of the personal

jurisdiction analysis applied in the Eighth Circuit—the nature and quality, the quantity,

and the relation of the cause of action to the contacts—are "closely interrelated [the

Court] consider[s] them together."  Northrup King Co., 51 F.3d at 1388.  The Court finds

that the correspondence cited by Plaintiff, and perhaps some alleged but unspecified

telephone conversations, are the only relevant contacts to a specific jurisdiction

analysis—any other contacts simply are not related to her causes of action.  Plaintiff

argued at the motion hearing that it is significant that the final proposal for the

conveyance of Edward's 4126 shares was drafted on the computer owned by Edward

Coen on May 23, 1996.  The Court disagrees.  Plaintiff's FAC does not contain any

contract claims and her allegations of fraud primarily concern representations made

years prior to the creation of the document Plaintiff cites.  Considering the aggregate of

the contacts alleged and the totality of the circumstances, see Northrup King, 51 F.3d at

1388, the Court finds that there is no clear connection between Defendants' contacts

and the causes of action alleged.

Furthermore, even if the Court were to find that minimum contacts had been

established over some or all of the named Defendants, the remaining two factors

considered in the five-part personal jurisdictional analysis—Minnesota's interest in

providing a forum for this lawsuit and the convenience of the parties—make exercising

personal jurisdiction over Defendants unreasonable.  See St. Jude Medical, 250 F.3d at

591 (noting that "personal jurisdiction may be defeated if its exercise would be

unreasonable considering such factors as . . . the burden on the defendant" and " the

41

interest of the forum State").  The Court is cognizant that where personal jurisdiction over foreign defendants is sought, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  Asahi, 480 U.S. at 114.  Here, while Minnesota has an interest in seeing that fraud perpetrated against one of its citizens is adjudicated in Minnesota, at least some of Plaintiff's causes of action will likely require the application of English laws. Additionally, all of the named Defendants are residents of France or England and the history preceding the filing of this lawsuit, as set forth by Plaintiff in the record, demonstrates that Plaintiff has already engaged English legal channels and counsel concerning the same or related claims (i.e., fraud in the inducement of a contract, fraud in the representation of the value of the subject matter, breach of fiduciary duty of a director to shareholders, breach of fiduciary duty of a trustee to a trust, and fraudulent transfer of trust assets).  (FAC (Doc. No. 12) Ex. I.B. Part I.)

Finally, while "[t]he burden of litigating in a foreign forum has become less significant as a result of advances in communication and transportation. . . . the law of personal jurisdiction is 'asymmetrical.'"  Fed. Deposit Ins. Corp. v. British-American Ins. Co., Ltd., 828 F.2d 1439, 1444 (9th Cir. 1987) (citations omitted).  "The primary concern is for the defendant's burden."  Id.  In a case such as this," where Defendants have 'done little to reach out to the forum state,' other than respond to inquires by its shareholder or co-director or beneficiary or family member, "the burden of defending [themselves] in a foreign forum militates against exercising jurisdiction."  Id.  While Plaintiff has compiled (and filed with her Complaint) many of the relevant documents in

this case and some of her proposed key witnesses are located in Minnesota or the

United States (Pl.'s Response at 30-31), many of the likely witnesses are located

overseas.  The Court finds that, overall, the convenience of the parties factor weighs in

favor of Defendants.

The Court, therefore, recommends granting Defendants' motion to dismiss for

lack of personal jurisdiction.  Because the Court recommends dismissing all of Plaintiffs'

claims without prejudice, the Court also recommends denying Plaintiff's pending motion

for summary judgment on the issue of personal jurisdiction as moot.

Therefore, having reviewed the parties' submissions and arguments,

**IT IS HEREBY RECOMMENDED that**:

1.      Defendants' Amended Motion to Dismiss (Doc. No. 77) be **GRANTED**;

2.      Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for

        Evidentiary Hearing on the Issue of Personal Jurisdiction (Doc. No. 102)

        be **DENIED as moot**; and

3.      All of Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE**.


Date: July 10, 2006

                                                 s/ Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States Magistrate Judge


Under D. Minn. L.R. 72.2(b) any party may object to this Report and Recommendation
by filing with the Clerk of Court, and serving all parties by July 27, 2006 a writing which
specifically identifies those portions of this Report to which objections are made and the
basis of those objections.  Failure to comply with this procedure may operate as a
forfeiture of the objecting party's right to seek review in the Court of Appeals.